UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID THOMPSON,

                Plaintiff,

- against -

THE CITY OF NEW YORK,
ERIK HANSEN, ET AL.,

                Defendants.

1:06-cv-14308-RJH-FM

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

In this action, pro se plaintiff David Thompson seeks damages of $2 million pursuant to 42 U.S.C. § 1983 for his arrest and two-week incarceration on charges of first degree robbery. Although a complaining witness identified Thompson as the person who robbed her in photographic and in-person lineups, Thompson contends, pointing to two other witnesses' inability to identify him, that the New York City Police Department's investigation of the underlying robberies was so unprofessional that it violated his constitutional rights. Defendants have moved for summary judgment. For the reasons that follow, defendants' motion is granted.

**I.    BACKGROUND**

Viewed in the light most favorable to Mr. Thompson, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record shows the following.

**A.    The April 2006 Robberies**

In April 2006, a person pretending to have a gun committed three robberies in Manhattan. On April 6, a complaining witness identified as "B.B." was crossing the street near Eighth Avenue and 135th Street. (Defs.' R. 56.1 Stmt. ¶ 18.) A man

- 1 -

approached, put his arm around her, and said "What's going on!" (*Id.*)  The couple then walked to 268 West 135th Street, where the man said, "Give me your fucking money!" (*Id.*)  When B.B. gave him a few dollars, the man replied, "I have a gun in my pocket and I will blow a hole in your stomach." (*Id.*)  The perpetrator reached into B.B.'s pocket, grabbed some $40 that B.B. had just withdrawn from Citibank, and fled. (*Id.*)

On April 8, 2006, a complaining witness identified as "W.G." was paying for food at the Seattle Café and Grill inside 1 Penn Plaza, a midtown high-rise. (*See* Fabian Decl. Ex. F.)  A man approached, said, "I got to talk to you about something serious," and escorted W.G. outside. (Defs.' R. 56.1 Stmt. ¶ 40.)  Pretending to hold a gun in his right jacket pocket, the man then said, "Do not think about hollering cause I got a gun and I will blow your goddamn brains out." (*Id.*)  W.G. handed over $227, and the perpetrator fled eastbound on West 33rd Street. (*Id.*)

On April 9, 2006, a complaining witness identified as "D.S." was walking toward the subway station on West 147th Street and St. Nicholas Avenue when he was approached by a man who put his arm around him and said, "Hey man, let me talk to you." (Defs.' R. 56.1 Stmt. ¶ 53.)  The man put his right hand in his right pocket and, pretending to point a gun, said, "This is a pistol here, give me all your cash." (*Id.*)  After D.S. gave him $20, the perpetrator said, "Give me all your cash, don't play with me." (*Id.*)  D.S. said he didn't have any more money and the perpetrator walked away. (*Id.*)

**B.      Detective Hansen's Investigation**

Detective Erik Hansen, who at the time was assigned to the New York City Police Department's Manhattan Robbery Squad, investigated all three crimes.  On May 7, 2006, Hansen visited the area around 750 St. Nicholas Avenue to look for surveillance cameras

that might have captured D.S.'s robbery. (*Id.* ¶ 55.) After searching the area, Hansen determined that the only camera that could have captured the robbery was located in a pharmacy opposite 750 St. Nicholas Ave. (Fabian Decl. Ex. J, at 2.) The pharmacy's owner, however, informed Hansen that "the camera was positioned facing the entrance and [did] not capture the area where the robbery took place." (*Id.*) The next day, Hansen visited West 134th Street between Adam Clayton Powell Boulevard and Fredrick Douglas Boulevard to look for surveillance cameras that might have captured B.B.'s robbery. (Defs.' R. 56.1 Stmt. ¶ 21.) Once again, Hansen could not locate any cameras that captured the crime. (*Id.*)

On May 8, 2006, Hansen interviewed B.B. and showed her approximately twenty pictures of possible suspects, not including Mr. Thompson. (*Id.* ¶ 19.) B.B. could not identify anyone in the photographs. (*Id.*) Two days later, Hansen created a photo array, a copy of which is appended to this opinion, that contained a mug shot of Mr. Thompson in position six. (*Id.* ¶ 23; *see* App. A.) Hansen testified that he created the array using a database maintained by the New York City Police Department, and selected subjects for it based on facial bone structure, hairlines, facial hair, eye color, and weight. (Defs.' R. 56.1 Stmt. ¶ 24.) Hansen visited B.B.'s work at about 5:35 p.m. and showed her the array. (*Id.* ¶ 25.) B.B. identified photo six—Thompson—as the man who robbed her. (*Id.*)

Thompson contends that by including him in the photo array, Hansen revealed he was out to get him. Thompson notes, for example, that although B.B. reviewed approximately 2,500 photos in a computer database on the day of her robbery, "Hansen was able to put together six (6) photos and miraculously there in the photo array is the

person that allegedly committed [the] crimes." (*See* Pl.'s Stmt. Concerning April 7, 2006 Robbery ¶ 9(g).) Thompson further contends that Hansen should have done more to verify his guilt after B.B. identified him. For instance, he asks: "why didn't the detective search the plaintiff[']s home to help justify his arrest, or collaborate it with the statements that were [given] to him." (*Id.* ¶ 24(q).)

On May 15, 2006, Hansen interviewed W.G., who lives out-of-state, by phone. (Defs.' R. 56.1 Stmt. ¶¶ 36, 38.) Later that day, Hansen contacted a local police department in the state where W.G. lives to make arrangements for W.G. to view the photo array. (*Id.* ¶¶ 42-43.) After W.G. viewed the array, he told an officer that "number six"—Thompson—"looks close." (Ex. D. to Fabian Decl. ¶ 38 ("Hansen Aff.").) The officer who showed W.G. the photo array had not been informed that Thompson was a suspect. (*Id.* ¶ 37.) Hansen later spoke with W.G., and W.G. told him that "the photo in position number six looked like the man that had robbed him, but his face looked a little fuller than the day [I] was robbed." (*Id.* ¶ 39.)

On May 24, 2006, Thompson was taken into custody during a scheduled visit to his parole officer. (Hansen Aff. ¶ 23.) After Thompson was transported to the Manhattan Robbery Squad, which is located on East 12th Street, Hansen organized a lineup, photographs of which are appended to this opinion. (*See* App. B.) Thompson chose to sit in the third position. (Fabian Decl. Ex. H, at 7.) At about 3:15 p.m., D.S. viewed the lineup. (*Id.*) She did not recognize anyone. (*Id.*) About fifteen minutes later, B.B. viewed the lineup and once again identified Thompson as the man who robbed her. (*Id.*)

- 4 -

Thompson contends that the lineup was unduly suggestive, noting that because the other "fillers" did not resemble him, "there was no way that this line-up would be conducted in a fair[,] impartial[,] or unbias[ed] manner. (Pl.'s Stmt. of Fact Concerning April 7, 2006 Robbery ¶ 24(r).) He continues: "Due to the description [of the perpetrator given to the police], [I] was the only one who came close to the description, even tough [I] was at least 100lbs more than [the person B.B.] described." (*Id.*) Though the record does not contain evidence that he was represented by counsel at the time, Thompson contends that the lineup also violated his right to counsel under the New York Constitution. *See People v. Coates*, 543 N.E.2d 440 (N.Y. 1989).

Based on B.B.'s two identifications, Hansen arrested Thompson. (Defs.' R. 56.1 Stmt. ¶ 61.) On May 31, 2006, a grand jury issued an indictment charging Thompson with robbery in the first degree. (Fabian Decl. Ex. O.) Thompson was released on June 6, 2008 after his family secured a $10,000 bail bond. (*See* Ex. G to Pl.'s R. 56.1 Stmt.)

On June 7, Thompson's attorney notified him that he was required to appear for a lineup on June 8. (Pl. Disputed Facts and Exs. to Def. S.J. Mot. ¶ 11.) According to notes taken by his attorney, Thompson arrived at the Manhattan Robbery Squad for the lineup at 11:00 a.m. (*See* Ex. H to Pl.'s R. 56.1 Stmt.) Thompson's attorney requested a double-blind lineup—one where the officer conducting the lineup has no knowledge of the facts of the investigation and does not know whether any suspect is present in the lineup. (*Id.*) Hansen replied "no way." (*Id.*) Five fillers arrived. (*Id.*) After Thompson's attorney complained about the absence of light-skinned fillers, Hansen explained the fillers he brought in were the only ones available. (*Id.*) After the complaining witness, W.G., was brought into the observation room, Hansen told him to

"Look through the glass and tell me if you recognize anyone." (*Id.*) W.G. looked for about twenty seconds, then "furiously" shook his head no. (*Id.*) Hanson again asked whether W.G. recognized anyone, and W.G. replied "no." (*Id.*)

On June 16, 2006, a grand jury voted to dismiss the indictment against Thompson after hearing Thompson testify. (*See* Ex. I to Pl.'s R. 56.1 Stmt.) On July 6, 2006, the State's case against Thompson was dismissed. (*Id.*)

### C. Procedural History

Five months later, Thompson filed this lawsuit against the City of New York, the Manhattan Robbery Squad, Detectives Anderson Walcott and Erik Hansen, Assistant District Attorney Randolph Clark, and the three complaining witnesses. After it became clear that some of these parties were immune from suit, Thompson filed an amended complaint asserting claims against the City, the Manhattan Robbery Squad, Erik Hansen, and Anderson Walcott.

Thompson's amended complaint alleged that he was falsely arrested, charged, and imprisoned (¶ 1); unlawfully strip-searched (¶¶ 2, 4); placed in a holding cell for an unreasonable amount of time (¶ 2); forced to participate in an unconstitutionally suggestive lineup (¶ 3); detained against his will for fourteen days (¶ 7); and forced to appear for a second unconstitutionally suggestive lineup (¶ 8). As a result of this illegal activity, the complaint alleged that Thompson was fired from his job (¶10); lost opportunities to socialize (¶ 17); and suffered deep depression, mental stress, nightmares of never seeing his family again, lost sleep, and "lack of eating" (*id.*). Furthermore, the arrest forced Thompson to see a therapist, and to begin taking anti-psychotic medication. (*Id.*) Thompson sought damages of $2 million. (*Id.* at 6, 8.)

On April 25, 2008, defendants moved for summary judgment. Because Thompson was incarcerated at the time, the Court, at Thompson's request, extended Thompson's time to respond to defendants' motion until February 6, 2009. (*See* Notice of Mot. for Enlargement of Time for Pl. to Answer Defs.' Mot. for S.J. (May 5, 2008).) On that date, the Court received an exhaustive opposition to defendants' motion for summary judgment.

## II. DISCUSSION

It is not clear from the record whether Thompson committed the April 2006 robbery of B.B. or whether, assuming he did not, a more careful investigation might have prevented his arrest. It is clear, however, that in investigating the robberies, none of the defendants named in this lawsuit violated Thompson's constitutional rights. While Mr. Thompson's arrest obviously resulted in a loss of liberty, Thompson has not identified evidence from which a reasonable jury could conclude that his constitutional rights were violated in the process.

### A. *Russo* Claim

Liberally construed, Thompson's complaint seeks damages for the violation of five federal rights. Of these, Thompson's strongest potential theory is that Detective Hansen unreasonably failed to investigate exculpatory evidence that might have established his innocence, a violation of his "right . . . to be secure in [his] person[], . . . against unreasonable searches and seizures." U.S. Const. amend. iv. The crux of this theory is that after W.G. and D.S. failed to identify Thompson in the May 24 and June 8 lineups, Hansen should have realized that "maybe these crimes were not connected." (Pl.'s Stmt. Concerning April 8, 2006 Robbery, ¶ 19.) Instead of drawing this

conclusion, Hansen, "in his thirst for a conviction," (Pl. Disputed Facts & Exs. to Def. S.J. Mot. ¶ 5), continued his efforts to convict Thompson. The better course, Thompson contends, would have been to take simple steps that would have conclusively established his innocence.

A recent line of decisions establishes that a government officer's indifference to a pretrial detainee's innocence will support a damages award under § 1983 if the plaintiff proves that: (i) he was wrongfully incarcerated for an unreasonable length of time; (ii) the defendant-officer, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence; (iii) the defendant-officer failed to do so; and (iv) the defendant-officer acted with a culpable mental state—i.e., with intent to unlawfully detain the plaintiff or deliberate indifference to his constitutional rights. *Russo v. City of Bridgeport*, 479 F.3d 196, 210-11 (2d Cir. 2007). *See, e.g.*, *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir. 1993) (holding deliberate indifference to misidentification during three day detention is actionable under § 1983); *Sanders v. English*, 950 F.2d 1152, 1161-62 (5th Cir. 1992) (holding failure to release plaintiff after learning of substantial exculpatory evidence is actionable under § 1983). In *Russo*—the first decision in this Circuit to recognize and apply this theory—the court held that a jury could award damages based on the defendant-officers' failure over sixty-eight days to turn over a videotape which showed that the perpetrator of a robbery, unlike the incarcerated plaintiff, had no tattoos on his arms. *See id.* at 209-10.

The record here does not contain enough evidence for a jury to conclude that Thompson is entitled to damages under the theory recognized in *Russo*. Assuming Thompson is innocent, he has not pointed out, nor has the Court's review of the record

identified, any evidence from which Hansen, at reasonable cost and effort, could have ascertained Thompson's innocence. All the evidence about the April 2006 robberies came from victims; and one of those victims identified Thompson—twice—as the man who robbed her. Thompson responds that Hansen should have obtained surveillance videotapes of the robberies. (*See* Amended Compl. ¶ 13.) But even assuming the Constitution imposes such a duty, Hansen has testified, and Thompson does not dispute, that he tried and failed to locate surveillance footage of the robberies. (Hansen Aff. ¶¶ 17, 48.)

Thompson's claim, then, rests on the theory that because D.S. and W.G. did not identify him, Hansen should have realized that he was innocent of the B.B. robbery. If all three robberies were committed by the same person, D.S.'s and W.G.'s failure to identify Thompson would indeed be strong evidence that Thompson didn't rob B.B. But nothing required Hansen to make that assumption, and Hansen could have reasonably concluded that, no matter who robbed D.S. and W.G., Thompson robbed B.B. For these reasons, summary judgment will be entered for defendants to the extent that Thompson asserts a *Russo* claim.

**B.     Thompson's Remaining Claims**

Thompson's remaining claims require only brief discussion.

*False Arrest.* The elements of false arrest and malicious prosecution under § 1983 are "substantially the same" as under New York law. *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003); *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992). To prevail, a plaintiff must establish that "(1) the defendant intended to confine [him], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the

- 9 -

confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). "There can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Id.* at 118; *see, e.g.*, *Boyd*, 336 F.3d at 75 (same); *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (same).

Here, B.B.'s identification of Thompson provided ample probable cause for Thompson's arrest. *Cf. Russo*, 479 F.3d at 204 (finding probable cause on basis of identification by robbery victim). While the Court can imagine circumstances where a victim's identification was so unreliable as to not establish probable cause, *see, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 292 (1994) (Stevens, J., dissenting) (describing undercover informant whose false accusations led to more than fifty aborted prosecutions), the record contains no evidence from which a jury could conclude that this happened here. The photo array B.B. viewed shows six men similar in appearance to Thompson. And while Thompson criticizes the in-person lineup B.B. viewed on a host of grounds, the Court cannot conclude, after reviewing photographs of the lineup, that the lineup was so defective as to preclude Detective Hansen from relying on it to establish probable cause. Probable cause, a "practical, nontechnical conception," *Illinois v. Gates*, 462 U.S. 213, 231 (1983), requires only that "officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. As B.B.'s identifications of Thompson satisfied this standard, summary judgment will be entered for defendants on Thompson's false arrest claim.

*Malicious Prosecution.*  To prevail on a claim for malicious prosecution under the law of this Circuit, a plaintiff must show, among other things, that he suffered (i) a deprivation of liberty (ii) resulting from a governmental seizure (iii) in the form of legal process that was (iv) without probable cause or otherwise unreasonable.  *See Singer*, 63 F.3d at 115-18; Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 3.18[C], at 3-609 (2005 & Supp. 2008) (same).  For the reasons just discussed, the record does not contain evidence from which a jury could find that Thompson has established the fourth element of a malicious prosecution claim.  Although the circumstances leading to Thompson's prosecution are not clear (*see* Hansen Aff. ¶¶ 56-57), the Police Department apparently caused Thompson to be prosecuted based on the same probable cause that led Hansen to arrest him.  And Thompson has not suggested, nor has the Court identified, any reason why the probable cause supporting Thompson's arrest did not also support his prosecution.  Accordingly, summary judgment will be entered for defendants on Thompson's malicious prosecution claim.

*Unconstitutional Lineup.*  If pretrial identification procedures are impermissibly suggestive, due process requires the exclusion of identification testimony at trial unless its reliability is established through independent evidence.  *See Moore v. Illinois*, 434 U.S. 220, 227 (1977).  Courts judge the suggestiveness of the procedures used under the "totality of the circumstances."  *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  "When the appearance of participants in a lineup is not uniform with respect to a given characteristic, the principal question in determining suggestiveness is whether the appearance of the accused, matching descriptions given by the witness, so stood out from all of the others as to suggest to an identifying witness that that person was more likely to

be the culprit." *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir. 1994) (formatting normalized).

Drawing on these principles, Mr. Thompson asserts a claim for damages based on his compelled participation in the May 24 and June 8, 2006 lineups—lineups, he contends, that were so suggestive as to violate due process. This claim fails for two reasons. First, as already noted, the Court finds no support in the record for Thompson's argument that the lineups were unconstitutionally suggestive. There is thus no support for the premise of Thompson's claim, that the lineups violated due process. Second, even if the lineups violated constitutional standards of suggestiveness, this fact would not support a damages award. In *Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007), the Second Circuit held that a police officer's unduly suggestive show up was not independently actionable under § 1983. *Id.* at 193. Instead, a constitutional violation occurs only if tainted evidence produced in an unlawful identification procedure is introduced at trial. *See id.* ("[T]he constitutional violation is that Wray's right to a fair trial was impaired by the admission of testimony regarding the unreliable identification . . . ."). As no tainted evidence was introduced at trial (there was no trial) any illegality in the lineups Thompson participated in does not support liability under § 1983.

*Unlawful Strip Searches.* Liberally construed, Thompson's complaint asserts a damages claim based his being forced to undergo unlawful strip searches while incarcerated at the Rikers Island jail. Although neither the Supreme Court nor the Second Circuit has ruled on the question, district courts in this Circuit have held that a felony arrestee who is incarcerated pending trial may only be strip-searched if the searching officer develops reasonable suspicion that the arrestee is carrying weapons or

contraband.  *See, e.g.*, *Harriston v. Mead*, No. 05 CV 2058 (RJD) (LB), 2008 WL 4507608, at *3 (E.D.N.Y. Sept. 30, 2008); *Murcia v. County of Orange*, 226 F. Supp. 2d 489, 494 (S.D.N.Y. 2002); *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002).

While the Court is mindful that strip searches work a significant invasion of constitutionally-protected privacy interests, the record contains no evidence from which a jury could conclude that any of the individual defendants named in this action personally caused Thompson to be strip-searched.  The only "evidence" concerning strip searches is the following statement from Thompson's amended complaint:

> Plaintiff states that the pain and suffering that he had to endure was [due] to the 14 or more days he was forced to stay locked upon Rikers Island and having to [endure] numerous strip [searches], having police officers, and correctional officer[s] degrade him by making him bend over to look inside of him, all while female officers as well as inmates were present. (Amended Compl. 6.)

Even if the Court were to accept this statement as true, it is insufficient to support a finding that Hansen, or any of the other named defendants, caused Thompson to be strip-searched.  Since "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006); *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 122 (2d Cir. 2004), summary judgment will be entered for defendants to the extent Thompson asserts a claim for illegal strip searches.

*Municipal Liability Claims.*  Finally, Thompson's filings can be read to assert a damages claim against the City on the theory that the Police Department maintained customs and practices that resulted in the deprivation of his rights.  *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).  This argument fails for two reasons.  First, "to

establish municipal liability, 'a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy.'" *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 122 (2d Cir. 1991)). As already discussed, Thompson has not demonstrated that his constitutional rights were violated. Second, even assuming that Thompson demonstrated a violation of his constitutional rights, he has failed to show that those violations resulted from official policy or custom. *See Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) ("To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983)). To the extent Thompson asserts claims against the City under *Monell*, summary judgment will be entered for defendants.

## III.   CONCLUSION

Defendants' motion for summary judgment **[46]** is granted. A copy of the unpublished opinion cited in this decision has been forwarded to Mr. Thompson. The Clerk is directed to close this case.

SO ORDERED.

Dated: New York, New York
       March 19, 2009

                                                    Richard J. Holwell
                                                    United States District Judge

## Appendix A: May 10, 2006 Photo Array



## Appendix B: May 24, 2006 Lineup



## Appendix C: June 8, 2006 Lineup

